**STEWART et v DENNEY et**

Ohio Appeals, 9th Dist, Summit Co.

Nos. 3092 & 3093.  Decided June 28, 1939

Slabaugh, Seiberling, Huber & Guinther, Akron, for appellees.

R. H. Nesbitt, Akron, for appellants in Case No. 3092.

Waters, Andress, Wise, Roetzel & Maxon, Akron, for appellants in Case No. 3093.

## OPINION

By ROSS, J.

Two appeals upon questions of law and fact from the Court of Common Pleas of Summit County are here involved.  These appeals are considered together, as each is an appeal from the same judgment.  The case in this court was tried upon the same pleadings as in the trial court.  Evidence in this court was introduced de novo.  The court viewed the premises.

By this action, specific performance of one certain contract entered into on the 14th day of May, 1902 is sought.  The parties to the contract were The Cleveland, Akron & Columbus Railway Company (hereinafter designated as the C. A. & C.), The Baltimore & Ohio Railroad Company (hereinafter designated as B. & O.), The Erie Railroad Company (hereinafter designated as the Erie) and The Northern Ohio Railway Company (hereinafter designated as N. O.).

It appears from the terms of this contract that the four railroads named

were in effect the sole owners of a fifth railroad, The Akron & Barberton Belt Railroad Company (hereinafter designated as the Belt). It is unnecessary to relate the several details alleged and proved by which the control of the Belt was effected. The separate entities of all five railroad companies was preserved. The Belt was not a party to the contract of which specific performance is sought, although made a party to this action.

By the terms of this contract, the four signatory Railroads agreed, among other things that:

"6. Nothing herein contained shall impose a liability upon either of the companies, parties hereto, to make any additions or improvements to said property, save with the voluntary consent of such company.

"Subject to the foregoing provision, the full board of directors of said company from time to time may provide additions and betterments, which, in their opinion may be necessary to enable the business of the companies using said property jointly to be properly accommodated; and the cost of such additions and betterments shall be added to the aggregate amount of the bonded indebtedness above mentioned, and four per cent interest thereon shall be computed and paid in the same manner as the rental hereinbefore provided for.

"7. In case of the partial or total destruction of any portion of said property by casualty of any kind, the same shall be rebuilt or replaced by said company, and the cost thereof shall be borne by the parties using said property, on the basis of car mileage computed during the period of one year next preceding statement of the same, as hereinbefore provided for interest and current expenses of maintenance and operation."

And it was further agreed:

"9. No railroad company other than those parties hereto, shall hereafter be admitted to a joint ownership in or use of said property save with the unanimous consent, duly recorded, of the companies parties hereto; and it is expressly stipulated and reserved on the part and behalf of the companies parties hereto, that one of the conditions upon which any company shall be admitted to an ownership in the property, shall be the execution of a copy of this agreement, unless the same is modified by unanimous consent. Failure or default on the part of any road so admitted to an ownership, in respect to any of the payments, stipulations, obligations or conditions herein set forth or provided for, all of which conditions are hereby declared to be essential, shall work a forfeiture of the ownership acquired.

"This agreement for the right of joint ownership of said property, subject to the conditions above stated, is hereby made perpetual to the companies accepting the same, and said companies do each by their acceptance of this agreement, bind and obligate themselves severally, and their legal successors, to forever continue in the joint ownersip and use as aforesaid, and subject to and upon the terms and conditions herein stated."

Several amendments of this contract were later added by mutual agreement of the signatory railroads. None of these amendments in the opinion of the court caused any change in the pertinent obligations involved.

The Akron, Canton & Youngstown Railroad Company (hereinafter designated the A. C. & Y.) was also not a signatory of the original contract. It asserts its claim for relief by virtue of assignment from the N. O.

The status of the N. O. and the A. C. & Y. will be later discussed in appropriate association with claims and defenses of the parties to this action.

In the petition it is alleged that a portion of the Belt Railroad was destroyed by fire and flood and that the defendant railroads, the Pennsylvania Railroad Company (hereinafter designated as the Pennsylvania) the B. & O.

and the Erie have failed to perform the provisions of the contract, quoted, and replace such destroyed sections, that by reason thereof, the railroads, of which the plaintiffs are Trustees, have suffered irreparable damage, for which they have no adequate remedy at law. The plaintiff trustees, therefore, pray for a mandatory injunction, the effect of which shall be to cause the Belt to replace the destroyed portions of its tracks, so that the railroad may be used by the railroads, of which plaintiffs are trustees.

The responsibility of the Pennsylvania, not a signatory, is asserted by reason of a claim that it succeeded to the rights and obligations of the C. A. & C., which railroad company is not made a party to this action.

The A. C. & Y. and the N. O. are represented in this action by the plaintiff trustees, appointed in certain proceedings in the United States District Court, for the Northern District of Ohio, under the provisions of §77 of the Acts of Bankruptcy, providing for the reorganization of railroads.

Each of the defendants filed a separate answer. In that of the B. & O. it is alleged that owing to the peat or bog fires, and the nature of the land on which the destroyed portion of the Belt railroad was laid, it is impossible to simply "replace" or restore such destroyed portions of the railroad without making "improvements", which, by the terms of the contract between the parties, shall not be required without the voluntary consent of the signatory railroads, and that the B. & O. has not given such consent.

As a further defense, it is alleged that the provisions of the contract, hereinbefore quoted, relating to admissions of parties to joint ownership in the Belt, was violated by the N. O., which conveyed a portion of its line of railroad to the A. C. & Y., and that no one of the signatories has consented to the admission of the A. C. & Y. to joint ownership in the Belt.

The answer of the B. & O. contains admissions relating to the execution of the contract, the location of the Belt road, the sale by the N. O. of part of its line, the location of interchanges as alleged in the petition.

In the answer of the Pennsylvania, after making admissions similar to those made by the B. & O. in its answer, the Pennsylvania asserts like defenses. In its answer, however, by its general denial, the Pennsylvania put in issue the allegations of the petition, asserting that the share in the Belt originally owned by the C. A. & C. was now owned by the Pennsylvania.

The answers of the Belt and Erie are essentially the same as those of the B. & O. and Pennsylvania.

The trustees for the Erie, appointed by the United States District Court for the Northern District of Ohio in a "debtor" proceeding in that court, instituted subsequently to the commencement of the instant action, have filed a motion requesting that no order be made contrary to an order made in such United States District Court as follows:

"(8) That all persons, firms and corporations, whatsoever, and wheresoever situated, located or domiciled, be and they hereby are restrained and enjoined from interfering with, seizing, converting, appropriating, attaching, garnishing, levying upon, or enforcing liens upon, or in any manner whatsoever disturbing any portion of the assets, goods, money, deposit balances, credits, choses in action, interests, railroads, properties, or premises belonging to, or in the possession of the debtor, or from taking possession of, or in any way interfering with the same, or any part thereof, or from interfering in any manner with the operation of its railroad or properties or the carrying on of its business by the debtor under the orders of this Court, or from commencing any suits or continuing any suits against the debtor, provided, that suits or claims for damages caused by the operation of trains, buses or other means of transportation may be filed and prosecuted to judgment in any Court of competent jurisdiction."

As will later herein appear, no order is made contrary to such order of the United States District Court, and such

motion may be, therefore, considered as granted.

A reply denying all new matter alleged in the several answers was filed by the plaintiffs.

From the pleadings, stipulations, and evidence, the following facts appear.

The Belt consisted of a V shaped railroad, comprising really two separate lines, which were united under one ownership by the creation of the Akron & Barberton Belt Railroad Company, which, in turn, was, in effect, owned by the C. A. & C., B. & O., Erie and N. O. Railroads. The arms of the V extended in a generally northwesterly and northeasterly direction. The southernmost part or apex of the V was in the City of Barberton. The western arm of the V, known as the "Fairlawn Extension", terminated in a point called Fairlawn, at which originally was located a point of interchange called Belt Junction. It was on this arm or extension that a portion of the Belt Railroad was destroyed by flood and fire. The portion destroyed being about 1½ miles in length and was located near the northern end of the Fairlawn extension—that is, it extended almost to Belt Junction. The eastern arm of the V, extending toward the northeast, and known as the Akron extension, terminated in what later became known as the Brittain Yard of the A. C. & Y., where it become an interchange point on that railroad. Across the top of the V, there developed a continuous line of railroad, the western portion of some nine miles being owned by the N. O., the eastern portion owned by the A. C. & Y., thus creating a continuous line from Belt Junction on the west to Brittain on the East and closing the V into a triangle, the western side of which was the Fairlawn Extension, the eastern side the Akron extension, and the northern side the N. O. and A. C. & Y. The west side of the triangle was approximately 6.92 miles in length, the east side of the triangle 14.04 miles in length, and the north side 10.21 miles in length.

Without going into detail, it is the conclusion of the court that the evidence, stipulations, and admissions in the pleadings conclusively show that in so far as is legally possible, the N. O. parted with all its interest in its line running eastwardly from Belt Junction some nine miles, and also divested itself of all interest in Belt and the contract made between the signatory railroads, in so far as it was again legally possible to do so. The effect of this situation is to cause the N. O. to lose any rights it might have under the contract and to cease to be the real party in interest in this action. As its conveyance of interest was to the A. C. & Y., that railroad became the real party in interest in this action, and it remains now to be determined how far such transferred rights may be asserted by the A. C. & Y. under the contract and circumstances prevailing among the parties involved. Without going into a minute discussion of the facts germane to this element of the case, it is sufficient to say that by the terms of the contract relied upon in this action, the A. C. & Y. could acquire no enforceable rights against the signatory defendants by which it would be entitled to the relief sought. The situation then is that the N. O. cannot enforce such rights and secure such relief because it has parted with the physical and legal premises upon which such rights could be asserted and the A. C. & Y. thus being the real party in interest cannot assert such rights or claim such relief because of the limitations of the contract, which it has named in its petition as the foundation of its action. It is obvious that both railroads cannot be real parties in interest.

This opinion might well end here, but in view of the considerations of equal importance which, in the opinion of the court, are conclusive against granting the relief sought by the plaintiffs, it is judged fair to all parties to set these out as briefly as is consistent with an intelligent statement of the predicates for the conclusions reached.

As to the Pennsylvania, it was never a part to the original contract, nor does there appear any consent to its

acquisition of the rights of the C. A. & C. Supplemental evidence has been tendered, however, indicating a ¼th interest in the Belt, and without passing upon this specific controversy, we consider that this railroad is freed from responsibility by virtue of conclusions reached applicable to the actual signatory railroads.

This is a proceeding in equity, in which the prayer for relief is addressed to the sound discretion of the Chancellor. It does not avowedly from the allegations of the petition involve the assertion of a clear legal right. The Chancellor is bound, therefore, to take into consideration all the circumstances involved and balance the equities between the parties. 5 Williston on Contracts, (Rev. Ed.), page 3992. Sec. 1425; Huntington et v Rogers et, 9 Oh St 511, at p. 516; Naughton v Morford-Wood Company, 90 Oh St 61; N. Y. C. Rd. Co. v Bucyrus, 126 Oh St 558; Ambrose v Kuhn, 11 O. Dec. (Rep.) 338, 26 Bull. 127.

The obligation to replace the destroyed portion of the Belt was upon four railroads. Essentially, this action constitutes an attempt on the part of one member of a joint group of four to compel the other three to co-operate with it in compelling a fifth party to do a certain act. In other words, the N. O., if it were still an active member of the group, would be just as much obligated to restore as any of the others, and in effect it would be asking this court to require it to do just what it is asking this Court to require of the other three—to say the least an anomalous situation.

Of course, no order can be made against the Belt, as it never contracted to do anything, and it becomes a little difficult to see, especially in view of the many changes in the positions and holdings of the original parties to the contract, just how the court could order the signatories or their assignees or trustees to make the Belt perform effectively.

It appears also that an application has been made to the Interstate Commerce Commission to permit the abandonment of service upon the portion of the Belt railroad destroyed by fire and flood. It may be that under the authorities, the existence of a remedy before this Commission may not in fact oust this court of equity jurisdiction, if this court were impelled by requirements of equitable principles to grant the relief requested. Certainly, however, in examining the entire matter and in seeking to determine whether this court is required to grant the extraordinary relief of a mandatory injunction, the Court may take into consideration the fact that it might order a most futile thing, in that if the Commission should order abandonment of service upon the portion of the road in question (and we can see many reasons why it should do so) and this court in the meantime, order construction of the replacement, we should have the situation of having required the expenditure of a considerable sum of money to restore a railroad, which was not required to be operated. Whether or not the plaintiffs have a full, complete, and adequate remedy at law is, therefore, not a consideration which is wholly dispositive of the fact that such a remedy does exist and is probably, as will later appear, the most effective one under the circumstances involved.

In U. S. Nav. Co. v Cunard S. S. Co., 284 U. S. 474, 481, the court states:

"The rule has become settled, that questions essentially of fact and those involving the exercise of administrative discretion, which were within the jurisdiction of the Interstate Commerce Commission, were primarily within its exclusive jurisdiction, and, with certain exceptions not applicable here, that a remedy must be sought from the commission before the jurisdiction of the courts could be invoked."

See also Id. page 485; and U. S. C. A. Title 49, Sec. 3, Par. 1-3.

In this connection, the real character of plaintiffs' complaint appears in their brief. The A. C. & Y., as has been said, now owning the N. O. section on the north side of the triangle, hauls from

the east across this side on its own original line and that of the N. O., so acquired, and thence on westwardly. By reason of the destruction of the section of the road on the Fairlawn Extension, the interchange at Belt Junction has been abandoned by Belt and an interchange at Brittain—the northeast terminal of the Akron extension, the east side of the triangle—installed to replace the Belt Junction interchange. This compels the A. C. & Y. to haul its cars southwardly on the Fairlawn Extension—south of the destroyed portion of that extension (there being a few—very few—shippers on this extension), to Barberton at the apex of the triangle on the south, thence northeastwardly on the Akron extention to Brittain, where junction is made with the main line of the A. C. & Y. It is claimed that this makes an added hauling cost. However, the shipper pays this cost. The location of the Brittain interchange is an advantage also in hauls from the east to Barberton, as otherwise the cars would have to go east to Belt Junction and then south on the Fairlawn Extension a considerably greater distance, unless, of course, both interchanges are to be maintained, which would be at an unwarranted expense to Belt. It is also asserted that Belt delivers cars too late at Brittain to make connections to the West, and that the differential again is adverse to A. C. & Y. and in favor of its competitors.

All of these matters dealing with the operation of connecting and competing railroads are peculiarly ▓▓▓▓▓▓▓ within the jurisdiction of the Interstate Commerce Commission and can be adjusted by that body with far more ease than can be done by a court, whose experience with traffic operations is but occasional. We quote from plaintiffs' brief:

"(26) Cars for Barberton industries (going to or coming from the West) are required to be hauled by A. C. & Y. from Brittain to Belt Junction, or the reverse, a distance of approximately eleven miles. It costs A. C. & Y. approximately $3.50 per car to make this haul. Receiving the cars at Brittain enables A. C. & Y. to make up its train in Brittain Yard and avoid the necessity of breaking the train at Belt Junction to put Barberton cars into it at that point. Interchange at Belt Junction would require A. C. & Y. to retain a part time Car Inspector at that junction and perform switching service there. The cost of these items to the Railroad is difficult to estimate, but was declared to be less than the cost of hauling the cars the extra distance, i. e., from Brittain to Belt Junction.

"In hauling cars from Barberton to Brittain, Belt conveys them over a distance twice as great (approximately) as that from Barberton to Belt Junction, thereby imposing greater cost upon itself."

"(19) * * * Switching charges for the service at Belt Junction is fixed at $6.60 per car. A higher switching charge, to-wit: $7.60, is fixed for switching cars from the tracks of the A. C. & Y. at Brittain to the Belt Line and transporting them."

"(15) Belt delivers cars to A. C. & Y. at Brittain after 5:30 in the evening. Running time to Cary and Delphos, (the examples used), is such that cars delivered to A. C. & Y. after 6:30 cannot possibly be transported to those points in time to meet outgoing trains of the Big 4 and Nickel Plate. Connections with these trains could be made if departure from Brittain were at or before 6 o'clock. Departure from Brittain at or before 6 o'clock could be made if cars were delivered at Brittain Yard before 6 o'clock by Belt.

"Earlier delivery by Belt (either at Brittain or Belt Junction) and earlier departure from Brittain by A. C. & Y. would result in earlier delivery of cars from Barberton at destination. Cars destined to Cincinnati would reach the consignee early in the morning of the following day instead of late in the afternoon of the following day as now. Cars destined for St. Louis would reach St. Louis twenty-four hours earlier than

present service. Points beyond St. Louis and Cincinnati would be progressively accelerated as to deliveries."

"(16) A. C. & Y. in 1935 and 1936, ran a train which made the connections used as examples at Carey and Delphos. Cars from Barberton industries were not included in the train because not delivered to Brittain in time to leave on it. Its departure time from Brittain was 6 o'clock. Cars from Barberton industries were, prior to 1932, always delivered at Belt Junction by Belt about three or four o'clock in the afternoon and could be carried to Carey and Delphos in time to gain the advantage of earlier delivery at destination. Belt has made deliveries at Brittain since 1932 many hours later than at Belt Junction before 1932. Although requested to make earlier deliveries at Brittain, it has refused to do so. Cars from Barberton industries (for example —Columbia Chemical) are available to be switched out by Belt at Noon and could be delivered either at Brittain or Belt Junction by 4 o'clock."

"(17) Shippers in Barberton can gain advantages in competition with orders in the same industry by securing earlier deliveries of cars to points West and South. Shippers owning their own equipment (Columbia Chemical, for example) suffer greater depreciation and repair costs on their cars because the same are transported over a longer distance when routed through Brittain than if sent westward over Fairlawn Extension connecting at Belt Junction. The car travels at least sixteen miles further and is subject to yard handling instead of road handling. Each of these items is reflected in depreciation and repair costs."

It can easily be imagined also that any order which the court might make, similar to that made by the trial court, might most easily involve those affected by it in serious difficulties, in view of the fact that a number of the parties are now in proceedings in the United States District Court. Certainly, such a dilemma is to be avoided, if possible.

Quite an amount of evidence by both plaintiffs and defendants was introduced as to the actual cost of replacement of the destroyed track. The sums ran from $25,000 to $75,000. The court made an inspection of a considerable portion of the destroyed track. It is evident to the court that the physical situation now is not the same as when the tracks were originally laid. The particular section of the road involved passes over a peat bog, which extends on both sides of the track for a considerable distance. The land is flat, and subject at times to heavy floods. It is also obvious that a peat or bog fire has destroyed a large area of the subsoil or bog. It is, therefor, at least questionable (and the burden of proof is, of course, upon the plaintiffs) whether or not the track could be "replaced" without an undertaking and expense which would amount to considerably more than a replacement and would not, in fact, be required to be classed as an "improvement" which would require the consent of the signatory railroads.

An added factor appears in the evidence. In the thirty-seven years that have passed since the execution of the original contract, the weight of both engines and freight cars as well as limits of capacity loads, have increased very considerably. It is in evidence that mere replacement of the old light rails and bed would not bear up modern equipment. It would be a futile thing to order the replacement of such light tracks and bed when this would necessitate the replacement of corresponding lighter equipment to haul—lighter cars and loads—which would pass out upon the main lines where such equipment is practically unknown.

Courts of equity reluctantly order performance when such performance requires supervision of more or less technical engineering construction. Such would be the case here. While in a proper case, a court might so order, unless justice demands this course as a last expedient, a court of equity will not enter upon such an extended su-

pervision of matters largely beyond its experience and knowledge. No impelling reason appears in the presentation of this case requiring this court to enter upon such an undertaking, fraught with possibility of serious difficulty, both to the court and the parties.

The evidence upon the element of irreparable damage, as has been heretofore indicated, is extremely meager and unconvincing, when considered in the light of other remedies open to the plaintiffs, which need not, and possibly should not be here suggested.

The plaintiffs, in a supplemental brief, have asked the court to either suspend its judgment pending decision of the proceedings before the Interstate Commerce Commission, or make its decree alternative upon the action of the Commission. We see in this request some acquiescence in the position taken by the court upon the question of other remedies available to the plaintiffs. In any event, the court sees no reason for complying with the request of the plaintiffs, in view of our conclusions upon the whole case, and the court must therefore decline to so order.

It is the conclusion of the court that the plaintiffs have failed to show any cause for equitable intervention in the premises, and that the relief prayed for must be denied, and the petition dismissed. It is so decreed.

STEVENS, PJ. & DOYLE, J., concur.